# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-00489-MSK-NYW

**JAMES R. DAWSON, JR.,**

      **Plaintiff,**

**v.**

**JEFF ARCHAMBEAU, the CEO of Colorado Health Partners;**
**RICK RAEMISCH, Executive Director of the Colorado Department of Corrections;**
**SUSAN TIONA, Chief Medical Officer of the Colorado Department of Corrections;**
**C. IRELAND, FCF Health Providers;**
**D. HIBBS;**
**T. SICOTTE; and**
**R. FRICKEY.**

      **Defendants.**

---

## OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND VARIOUS OTHER PENDING MOTIONS

---

**THIS MATTER** comes before the Court on four summary judgment motions. The Court has considered the motions and briefing for: (1) Defendants Robert Frickey, Susan Tiona, and Rick Raemisch's Motion for Summary Judgment (**#152**), Plaintiff James R. Dawson, Jr.'s Responses (**#161** and **#162**), and these Defendants' Reply (**#163**); (2) Defendant Jeff Archambeau's Motion for Summary Judgment (**#144**), Mr. Dawson's Response (**#165**), and Mr. Archambeau's Reply (**#169**); (3) Defendants Cynthia Ireland and Trudy Sicotte's Motion for Summary Judgment (**#141**), Mr. Dawson's Response (**#161**), and Ms. Ireland and Ms. Sicotte's Reply (**#163**); and (4) Defendant Dee Ann Hibbs' Motion for Summary Judgment (**#179**), Mr. Dawson's (**#180**), and Ms. Hibbs' Reply (**#183**).

Also before the Court are Mr. Archambeau's Motion to Strike Mr. Dawson's Surreply (**#174**), Mr. Dawson's Motion to Take Judicial Notice (**#175**), and Ms. Hibbs' Motion for Leave to Disclose and Reply Upon Expert Evidence and Testimony (**#178**).

## I.     Jurisdiction

Mr. Dawson[1] is an inmate incarcerated at the Fremont Correctional Facility ("Fremont"), which is administered by the Colorado Department of Corrections ("CDOC").  He has been diagnosed with Hepatitis C, and his claims in this lawsuit arise from his alleged failure to receive treatment for that diagnosis.   In particular, Mr. Dawson brings claims pursuant to 42 U.S.C. § 1983, and the Court exercises federal question jurisdiction pursuant to  28 U.S.C. § 1331.

## II.     Factual Background

The following facts are undisputed except where noted.  They are construed in the light most favorable to Mr. Dawson, an supplemented as necessary in the court's analysis.

Mr. Dawson has been incarcerated since 1992.  He suffers from Hepatitis C, which he acquired through a blood transfusion many years ago.  Mr. Dawson asserts[2] that his Hepatitis C has progressed over the term of his incarceration and that he is now experiencing symptoms consistent with end-stage liver disease.  Mr. Dawson initially attributed these purported symptoms to suspected colon cancer, and therefore, he did not aggressively pursue treatment for

---

[1]     Mr. Dawson is proceeding as a *pro se* plaintiff.  In such cases, the Court will construe *pro se* pleadings and other filings liberally and will not hold them to the same stringent standards applied to pleadings drafted by lawyers.  *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

[2]     Mr. Dawson did not support his responses to the Defendants' motions with a formal affidavit or declaration, as required by Fed. R. Civ. P. 56(c)(1)(A).  Nevertheless, his filings do contain assertions of fact that appear to be made upon his personal knowledge.  Because Mr. Dawson's papers are construed liberally as an unrepresented party, and because he presumably could (and would, if required) be able to reduce the facts of which he has personal knowledge to a sworn affidavit, the Court will treat factual statements clearly within the scope of Mr. Dawson's personal knowledge as if they were properly asserted through an affidavit as required by Rule 56.  *See, e.g., Jackson v. Cheyenne Mtn. Conf. Resort*, 92 F. Supp. 2d 1118, 1122 n.3 (D. Colo. 2000).

his Hepatitis C until late 2013. As a result of this decision to delay the initiation of treatment, he declined liver function tests in at least 2004 and 2012.

In recent years, a number of new medications have come to market to treat or cure Hepatitis C. Many have an impressive cure rate with limited side effects.[3] For example, the evidence in the record indicates that some of them (*e.g.*, Harvoni, Epclusa, *etc.*) successfully cure the infection in 95-99% of individuals taking the medication. Unfortunately, these medications are also very costly. Likely as a result, CDOC has devised and implemented its Clinical Standards and Procedures for Hepatitis C Evaluation, Management and Treatment (the "Protocol"), which governs the monitoring of and treatment available to CDOC inmates with Hepatitis C.

Under the Protocol, to be eligible for the new medication therapy, an inmate with Hepatitis C must: (1) have contracted the infection at least twenty years ago; (2) be under 65; (3) have a life expectancy of twenty years or more; (4) be at risk of developing end-stage liver disease or liver cancer; (5) have an elevated liver enzyme count for at least six months; (6) have sufficient time left in his sentence to complete a course of treatment; and (7) have begun and continued with an alcohol and drug education program.[4] These eligibility criteria are intended to be facially-neutral and inmate-specific, and inmates are intended to be evaluated for treatment options based on their specific individual situation and health status. If an inmate is eligible for treatment (and is confirmed to have Hepatitis C through blood testing), the first step is to undergo a liver screening test to determine whether there has been any liver damage. This is

---

[3]     Previously, the standard treatments for Hepatitis C normally consisted of Interferon and some other antiviral medication. That treatment had mixed results in curing the disease and often came with severe side effects.

[4]     This requirement existed until April 2013. At some point in time, it appears that CDOC at least allowed it to be waived in appropriate circumstances.

done by assessing the ratio of an inmate's AST (a liver enzyme that can indicate liver damage if detected in higher levels) to his or her platelet count, which is known as the inmate's "APRI" score. If an inmate's APRI score is below 0.4, no treatment will be provided other than yearly testing. If an inmate's APRI score is between 0.40 and 0.70, the inmate will receive ongoing drug and alcohol treatment referrals in addition to yearly screening.[5] If an inmate's APRI score is greater than 0.70, the inmate will begin undergoing Hepatitis C treatment (after completion of the drug/alcohol treatment program). That treatment includes additional screening for liver damage and screening for liver cancer, ultrasound screening for cirrhosis and accompanying esophageal varices, and where medically indicated, administration of the appropriate Hepatitis C medication (potentially including Harvoni, Epclusa or Ribavarin).

Mr. Dawson claims that he meets all of the criteria imposed by the Protocol. He first requested treatment under the Protocol from Dr. Ireland in November 2013, when he saw her after complaining about blood in his stool. Dr. Ireland scheduled him for a late January 2014 appointment to assess his condition, and she told him that he should obtain a copy of the paperwork verifying that he previously had completed the alcohol and drug education program.[6] Mr. Dawson claims that at this same appointment, he "informed" Dr. Ireland that he was experiencing "disabling pain, swelling in his stomach, bitter taste in his mouth, and light colored stool (symptoms of end-stage liver disease)." There is no indication that Dr. Ireland ordered any

---

[5]     Under a prior iteration of the Protocol, no annual drug and alcohol treatment referral was given for inmates with an APRI score between 0.40 and 0.70, and these were just subject to the yearly testing and monitoring.

[6]     It is unclear whether participation in an alcohol and drug education program was a requirement for treatment with the new Hepatitis C medications at the time of Mr. Dawson's appointment with Dr. Ireland, and, if was waivable, whether Dr. Ireland was aware of that possibility.

additional treatment for that purported complaint other than to schedule his Hepatitis C appointment.

Mr. Dawson had another appointment in early January 2014 with Ms. Sicotte, a nurse practitioner with the CDOC. The purpose of this visit was a routine post-procedure follow-up after Mr. Dawson received some unspecified treatment at Pueblo Endoscopy. Mr. Dawson says that he "informed [Ms. Sicotte] of his [Hepatitis C] disease symptoms," but she "ignore[d] [his] painful symptoms of end-stage liver disease." It is not clear what specifically he told Ms. Sicotte about these "painful symptoms." Mr. Dawson further contends that Ms. Sicotte told him that was already scheduled for an appointment in late January 2014 (approximately three weeks later), and that she prescribed no additional Hepatitis C-related treatment for him at this time (she did prescribe magnesium citrate to take prior to his next scheduled colonoscopy).

On January 29, 2014, Mr. Dawson met with Mr. Frickey, a nurse practitioner, apparently for an assessment of his eligibility for the Protocol. There is a dispute between the parties as to the events of this appointment, which centers around the question of whether Mr. Dawson did or did not refuse Hepatitis C treatment at this time. According to Mr. Dawson, he specifically asked to begin that treatment and to receive care for his "painful symptoms" of end-stage liver disease, which he says that he relayed to Mr. Frickey. As was the case with respect to Ms. Sicotte, it is somewhat unclear as to what these reported symptoms actually were, and what exactly Mr. Dawson told Mr. Frickey about them.[7] Mr. Dawson further says that Mr. Frickey told him that Hepatitis C treatment would be provided to him, either by Mr. Frickey or by

---

[7] In his brief responding to Mr. Frickey's summary judgment motion, Mr. Dawson subsequently says that he was suffering from "symptoms of untreated hepatitis-c," which he identifies as including "disabling abdominal pain, swelling in his stomach, light colored stool, fatigue, occasional bitter taste in his mouth, [and] dark tea colored urine." However, he does not say which of these purported Hepatitis C symptoms – if *any* – he reported to Mr. Frickey.

another provider.  There is no evidence before the Court showing that Hepatitis C treatment was commenced for Mr. Dawson in the immediate time period subsequent to his appointment with Mr. Frickey, though as noted below, there is evidence that Mr. Dawson received the relevant liver screening test no later than June 2015.  At that time, his APRI score was 0.329, well below the 0.70 threshold for administration of medication and even below the 0.40 threshold at which he would be referred for annual testing.  Mr. Dawson's test results also showed an AST (liver enzyme) result of 23, which is well within normal range.

Mr. Dawson also was treated by Ms. Hibbs, a nurse, on August 25, 2015.  The parties agree that Ms. Hibbs and Mr. Dawson discussed his Hepatitis C treatment options.  There is no dispute that they discussed the purported requirement that Mr. Dawson complete (or have completed) a drug and alcohol treatment program, and Ms. Hibbs gave Mr. Dawson a "contract" concerning the treatment of his Hepatitis C condition to sign.  Ms. Hibbs also ordered several blood tests to evaluate his then-current Hepatitis C status (viral load and genotype).  Blood was drawn on October 1, 2015, and the lab results were reported back on October 5, 2015; Ms. Hibbs entered these results in Ms. Dawson's chart.  This was the full extent of her interaction with Mr. Dawson.  As was the case with the other providers discussed above, Mr. Dawson broadly suggests that he told Ms. Hibbs that he was suffering from "painful symptoms" of Hepatitis C, but it is unclear what precisely he told her.  Mr. Dawson does say that he told Ms. Hibbs that he had been experiencing abdominal pain for more than a year, but he does not specify whether he explained the exact nature of that pain or its severity.  The specific treatment note corresponding with the August 25, 2015 encounter did not reflect any complaints of pain or other severe symptoms.

Mr. Dawson commenced this action asserting three claims under 42 U.S.C. § 1983: (1) as against Mr. Raemisch, Ms. Tiona and Mr. Archambeau, he contends that they created and implemented policies that allow inmates other than Mr. Dawson to receive a particular Hepatitis C treatment, depriving him of his right to equal protection under the Fourteenth Amendment to the U.S. Constitution; (2) as against Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey, he alleges that they violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs; and (3) as against Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey, he alleges that they violated the Fourteenth Amendment's Procedural Due Process clause by failing to follow the Protocol and provide him with Hepatitis C treatment. Mr. Dawson also may be asserting a Fourteenth Amendment substantive due process claim against one or more of the Defendants, which the Court will address below.

## III.     Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Thus, the primary question presented to the Court in considering a Motion for Summary Judgment or a Motion for Partial Summary Judgment is: is a trial required?

A trial is required if there are material factual disputes to resolve. As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). A fact is material if, under the substantive law, it is an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

The consideration of a summary judgment motion requires the Court to focus on the asserted claims and defenses, their legal elements, and which party has the burden of proof. Substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson*, 477 U.S. at 248; *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). As to the evidence offered during summary judgment, the Court views it the light most favorable to the non-moving party, thereby favoring the right to trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts – when the movant has the burden of proof and when the non-movant has the burden of proof. Each context is handled differently. When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense. *See* Fed. R. Civ. P. 56(c)(1)(A). Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law. However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

A different circumstance arises when the movant does not have the burden of proof. In this circumstance, the movant contends that the non-movant lacks sufficient evidence to establish a *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party must identify why the respondent cannot make a *prima facie* showing; that is, why the evidence in the record shows that the respondent cannot establish a particular element. *See Collins*, 809 F.3d at 1137. If the respondent comes forward with sufficient competent evidence to establish a *prima*

*facie* claim or defense, then a trial is required.  Conversely, if the respondent's evidence is inadequate to establish a *prima facie* claim or defense, then no factual determination of that claim or defense is required and summary judgment may enter.  *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

## IV.     Analysis

### A.     Mr. Dawson's Eighth Amendment Deliberate Indifference Claim against Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey.

Mr. Dawson asserts that Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey each acted with deliberate indifference to his need for adequate treatment and care for his Hepatitis C condition in violation of his Eighth Amendment rights.  These Defendants contend that Mr. Dawson has not come forward with evidence sufficient to establish either the objective or subjective elements of his Eighth Amendment deliberative indifference claim.

The Eighth Amendment states:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend. VIII.  That prohibition also prohibits prison officials from acting with deliberate indifference towards an inmate's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 102-05 (1976).  To establish a *prima facie* claim for deliberate indifference under the Eighth Amendment, Mr. Dawson must come forward with evidence that shows: (1) he was suffering from a serious medical need that posed a risk of serious harm to him if untreated; and (2) that each defendant was subjectively aware of that need and the risk of harm it posed to the inmate, yet purposefully chose to ignore it. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  A sufficiently serious medical need is one that has been diagnosed by a physician as requiring treatment or is so obvious that even a lay person would easily recognize the need for medical attention.  *Hunt v. Uphoff*, 199 F.3d

1220, 1224 (10th Cir. 1999); *Swan v. Physician Health Partners, Inc.*, 212 F. Supp. 3d 1000, 1006 (D. Colo. 2016).

### 1. Objective serious medical need.

Dr. Ireland, Ms. Sicotte and Mr. Frickey first argue that Mr. Dawson has not come forward with evidence establishing that his condition constituted a sufficiently serious medical need. They cite a number of authorities observing that Hepatitis C is a chronic, long-lasting illness that can take years to progress to the stage where it is an acute health concern, and as such, it is not a serious health need for the purposes of the Eighth Amendment deliberate indifference analysis. *See, e.g., Whitington v. Moschetti*, 423 Fed. App'x 767, 773 (10th Cir. 2011).

The Court understands this argument to be one made in the abstract – simply having Hepatitis C does not necessarily constitute a serious medical need. That is correct, but the question is whether Mr. Dawson had a serious medical need given the <u>state</u> of his Hepatitis C condition. This is a factual question.

Here, Mr. Dawson both offers both his diagnosis of Hepatitis C, and he says that he is suffering from various purported acute symptoms associated with end-stage liver failure, including disabling pain, nausea, fatigue, swelling in his stomach, bitter taste in his mouth, and light colored stool. It may be true, as the cited authorities find, that the *early* stages of Hepatitis C do not amount to a serious health condition; here, however, Mr. Dawson has alleged that his condition has progressed to symptoms associated with end-stage liver failure, including substantial pain. Moreover, these professed symptoms appear to be associated with end-stage liver disease (or at least there is no dispute that they could be), which <u>is</u> a serious medical need. Therefore, at least for the purposes of the summary judgment analysis, the Court will assume that

Mr. Dawson has produced sufficient evidence to establish a *prima facie* case that he has an objectively serious medical need.

## 2.    Subjective indifference.

Dr. Ireland, Ms. Hibbs, Ms. Sicotte, and Mr. Frickey all argue that Mr. Dawson has not come forward with sufficient evidence to establish that they were aware of his serious medical need (which the Court construes as both his need for ongoing Hepatitis C treatment *and* treatment for his acute present symptoms) and deliberately ignored the need or declined to provide treatment.  Because each of these Defendants interacted with Mr. Dawson in a different way, the Court will address each of them separately.

### *Dr. Ireland*

Dr. Ireland only had a single interaction with Mr. Dawson – a November 26, 2013 appointment precipitated by Mr. Dawson's complaint of rectal bleeding.  At this appointment, Mr. Dawson expressed his desire to begin Hepatitis C treatment, and Dr. Ireland put him on the schedule for a future appointment to address treatment in late January 2014.

Mr. Dawson contends in his response briefing that Dr. Ireland should have noticed the lack of regular testing and/or Hepatitis C monitoring in his medical records and ordered tests on the spot, rather than scheduling him for an appointment approximately two months later.  Mr. Dawson also contends that she also should have done more to acknowledge and treat him when he "informed" her that he was suffering from "disabling pain, swelling in his stomach, bitter taste in his mouth, and light colored stool (symptoms of end-stage liver disease)."  Dr. Ireland agrees that they discussed possible Hepatitis C treatment, and she scheduled him for a future appointment, but she does not specifically address Mr. Dawson's contention that he reported

symptoms of possible end-stage liver disease to her and she failed to provide any treatment for them.

It is well-settled in the Tenth Circuit that an inmate presenting with a medical problem is not entitled to any and all treatment that he or she believes should be provided; he or she is only entitled to medical care that is reasonably designed to meet his or her routine and emergency health care needs. *Sherman v. Klenke*, 653 Fed. App'x 580, 587 (10th Cir. 2016); *Chandler v. Rodriguez*, 74 Fed. App'x 1, 3 (10th Cir. 2003); *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996). In other words, for the purposes of the Eighth Amendment deliberate indifference analysis, it is not enough that an inmate simply disagrees with the medical treatment or medication that was ordered or prescribed to him or her. *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006); *Sherman*, 653 Fed. App'x at 586. The Tenth Circuit has explained this principle at length:

> As for [the inmate's] allegations concerning [the prison doctor], the district court correctly observed that some allegations indicate not a lack of medical treatment, but a disagreement with [the prison doctor's] medical judgment in treating a condition with certain medications rather than others. For example, [the inmate] alleges that he was not given the medications he desired for his headaches; but he admits being given other medications, so his complaint amounts to merely a disagreement with [the prison doctor's] medical judgment concerning the most appropriate treatment. An Eighth Amendment violation requires both a sufficiently serious medical need and deliberate indifference by the health-care provider. Disagreement with a doctor's particular method of treatment, without more, does not rise to the level of an Eighth Amendment violation.

*Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010).

When the evidence is viewed in the light most favorable to Mr. Dawson, his complaints about Dr. Ireland's treatment plan for his Hepatitis C are simply a disagreement as to the particular method of treatment she chose to offer: she believed his condition warranted an further (and more formal) evaluation in two months; Mr. Dawson believed it warranted more expedited review. This is not a situation in which Dr. Ireland *ignored* Mr. Dawson's medical need – that is,

his need for possible Hepatitis C treatment – by, for example, refusing to make any appointment for him to begin screening and treatment under the Protocol. To the contrary, Dr. Ireland specifically directed Mr. Dawson to obtain records that he would need, such as the drug and alcohol treatment records, so as to begin the first steps of the Protocol at the January 2014 appointment. Mr. Dawson does not point to any increased risk of harm he faced if his ongoing disease status was not addressed immediately in November 2013, rather than in January 2014 – much less that Dr. Ireland was subjectively aware of such an increased risk during this encounter – and thus, the Court cannot find a genuine dispute of fact as to whether Dr. Ireland was subjectively deliberately indifferent to Mr. Dawson's medical needs in this regard.

The question of whether Dr. Ireland was subjectively deliberately indifferent to Mr. Dawson's <u>present</u> symptoms of end-stage liver disease is a closer call. As explained above, Mr. Dawson contends that he informed Dr. Ireland that he was experiencing "disabling pain, swelling in his stomach, bitter taste in his mouth, and light colored stool (symptoms of end-stage liver disease)." There is no dispute that Dr. Ireland did not provide Mr. Dawson with any treatment (other than scheduling him for a future Hepatitis C appointment) specifically directed at any such alleged symptoms. The Court further notes that ignoring an inmate's complaints of severe, ongoing pain at least *can* constitute actionable deliberate indifference in violation of the Eighth Amendment. *See, e.g., Al-Turki v. Robinson*, 762 F.3d 1188, 1193-94 (10th Cir. 2014); *Mata v. Saiz*, 427 F.3d 745, 756 (10th Cir. 2005); *Riddle*, 83 F.3d at 1204.

The problem for Mr. Dawson is that the evidence that he has submitted to show that he was experiencing the sort of severe or intense pain that might serve as the predicate for a deliberate indifference claim against Dr. Ireland simply is not enough to defeat summary judgment. It consists of a single ambiguous statement in his summary judgment briefing – not

even in an affidavit or declaration – that he was experiencing a laundry list of symptoms that he conveniently informs the Court (and perhaps also Dr. Ireland?) are associated with end-stage liver disease.  Indeed, Mr. Dawson's inclusion of the parenthetical is particularly troubling, given that people generally do not speak in parentheticals, and it creates significant doubt for the Court as to what, exactly, Mr. Dawson reported to Dr. Ireland.  Did he report these specific symptoms (in these words)?  Or did he just tell Dr. Ireland that he was experiencing "symptoms of end-stage liver disease" and the symptoms he lists are offered to the Court as examples?

The bottom line is that it is unclear to the Court whether Mr. Dawson is saying that he reported actual symptoms to Dr. Ireland, or whether he merely was relaying a self-diagnosis of end-stage liver disease to her.  If it is the latter, it clearly is insufficient to defeat summary judgment.  *See, e.g., Green v. Senkowski*, 100 Fed. App'x 45, 47 (2d Cir. 2004); *Dixon v. Nusholtz*, 187 F.3d 635, 1999 WL 507031, at *1 (6th Cir. 1999).  In any event, as noted above, Mr. Dawson has the burden of presenting evidence sufficient to establish a *prima facie* case for each of his claims.  Insofar as he contends that Dr. Ireland failed to treat acute, painful symptoms of Hepatitis C, the foregoing single, ambiguous statement in his brief is not enough to do so, even construed liberally.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient….").  Thus, the Court finds that Dr. Ireland is entitled to summary judgment on this claim.

### Ms. Sicotte

A similar analysis applies with respect to the Eighth Amendment claim against Ms. Sicotte.  Ms. Sicotte saw Mr. Dawson one time, on January 7, 2014, after Mr. Dawson had received care from a non-CDOC provider.  As explained above, although there is a factual

dispute as to whether Mr. Dawson and Ms. Sicotte even spoke about his Hepatitis C diagnosis and potential treatment, even assuming that he did, Ms. Sicotte would have seen that he was scheduled for an appointment to address his treatment options within the month, and it would be within her medical judgment to decide that any Hepatitis C treatment could wait until that time. Mr. Dawson certainly has produced no evidence to suggest that his condition was such that a delay of a few weeks would cause him substantial harm, much less that Ms. Sicotte recognized that fact as well.

With respect to Mr. Dawson's claim that Ms. Sicotte deliberately ignored his report that he was experiencing "painful symptoms of end-stage liver disease," he provides even less evidence than he did with respect to Dr. Ireland. While there was at least some question as to whether Mr. Dawson articulated specific symptoms to Dr. Ireland, there is no such evidence with respect to Ms. Sicotte. The only evidence presented by Mr. Dawson is that he told Ms. Sicotte that he was experiencing vague and unspecified "painful symptoms" that he attributed to end-stage liver disease. There is no indication in his summary judgment briefing as to whether he disclosed precisely what those "painful symptoms" were. This certainly is not enough to meet his burden at the summary judgment stage of the litigation. Ms. Sicotte is entitled to summary judgment on this claim as well.

### Ms. Hibbs

The same rationale also applies to Ms. Hibbs. As explained above, Ms. Hibbs saw Mr. Dawson a single time, on August 25, 2015, at which time she discussed the various steps of the Protocol with him and ordered various screening lab tests, which she ultimately entered in his chart on October 5, 2015. This appears to be the entirety of her interaction with and treatment of Mr. Dawson. The undisputed evidence shows that Ms. Hibbs and Mr. Dawson discussed his

Hepatitis C treatment options and what he would need to do to procure that treatment, and Ms. Hibbs apparently started the paperwork and ordered the lab tests that would be necessary for him to seek treatment. As was the case with Dr. Ireland and Ms. Sicotte, that is enough for the Court to find that Mr. Dawson has not come forward with sufficient evidence to show that Ms. Hibbs was subjectively indifferent to his Hepatitis C diagnosis.

With respect to Mr. Dawson's claim that he reported "painful symptoms of hepatitis-c" to Ms. Hibbs, but she failed to provide care for those symptoms, Mr. Dawson's evidence of any such communications consists of a pair of isolated statements in his response brief indicating that Ms. Hibbs failed to treat his vague and unspecified "painful symptoms." Mr. Dawson goes on to catalogue a laundry list of symptoms that he said that he was experiencing, but he does not clearly indicate that these were the symptoms (if any) that he actually reported to Ms. Hibbs. Mr. Dawson also states that he told Ms. Hibbs that he had been experiencing "abdominal pain for over a year," but there is no evidence that he reported that it was the sort of severe or intense pain necessary to constitute a serious medical need for the purposes of the Eighth Amendment deliberate indifference analysis. "Where pain is the claimed harm, 'not every twinge... suffered as a result of delay in medical care is actionable.'" *Beers v. Ballard*, 248 Fed. App'x 988, 992 (10th Cir. 2007) (quoting *Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006)). In order to defeat summary judgment on his deliberate indifference claim against Ms. Hibbs, Mr. Dawson needed to provide evidence that the level of abdominal pain he reported to her was sufficiently severe to be actionable. He did not do so. Summary judgment on his Eighth Amendment deliberate indifference claim against her is warranted accordingly.

*Mr. Frickey*

A somewhat different analysis is necessary with respect to Mr. Dawson's Eighth Amendment deliberate indifference claim against Mr. Frickey, especially insofar as it concerns his treatment for Hepatitis C. There is no dispute that Mr. Dawson attended an appointment with Mr. Frickey – a nurse practitioner – on January 29, 2014 to explore Hepatitis C treatment options. There *is* a dispute, however, as to whether Mr. Dawson expressed a desire to begin treatment for his Hepatitis C at this appointment, or whether he changed his mind about treatment. For purposes of this motion, the Court adopts Mr. Dawson's version of these events – *i.e.*, that he asked Mr. Frickey to begin the treatment, and he did not change his mind about that (as reported by Mr. Frickey). There is no dispute that Mr. Dawson did not receive any Hepatitis C medication in the immediate aftermath of his appointment with Mr. Frickey. However, there is evidence in the record that Mr. Dawson subsequently did receive the screening tests required by that Protocol. Specifically, Ms. Hibbs has produced evidence that Mr. Dawson underwent liver screening tests in June 2015, and that his APRI score was not high enough to proceed to the next stage under the Protocol. Thus, the record reflects that Mr. Frickey provided "treatment" to Mr. Dawson, in the form of further testing and evaluation, but that medical staff ultimately concluded that Mr. Dawson's condition was not so advanced as to warrant further intervention. Thus, Mr. Dawson has not shown a genuine dispute of fact as to whether Mr. Frickey manifested subjective indifference to his condition.

Admittedly, Mr. Dawson's testing occurred some 18 months after his meeting with Mr. Frickey. "Where a prisoner claims that harm was caused by a delay in medical treatment, he must 'show that the delay resulted in substantial harm….'" *Al-Turki*, 762 F.3d at 1193 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)). Mr. Dawson has not shown that the 18-month delay caused him to suffer any particular harm, especially where the testing ultimately

revealed that Mr. Dawson would not proceed to further stages under the Protocol. If he had been scheduled for the testing promptly in January 2014 (or shortly thereafter), nothing would have been different.

With respect to any claim that Mr. Frickey disregarded Mr. Dawson's reports of acute present symptoms associated with end-stage liver disease, the Court notes that, as was the case with Ms. Sicotte, Mr. Dawson merely states that he told Mr. Frickey that he was experiencing "painful symptoms" of Hepatitis C. He has not stated, with specificity, precisely what symptoms he reported to Mr. Frickey. Mr. Dawson does go on in his response to Mr. Frickey to list out specific symptoms that he associates with end-stage liver disease, but he does not affirmatively state that he expressly reported those symptoms to Mr. Frickey. Accordingly, Mr. Frickey is entitled to summary judgment on Mr. Dawson's 8th Amendment claim as well.

> **B.  Mr. Dawson's Fourteenth Amendment Procedural Due Process Claim against Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey for Failure to Follow the Protocol.**

Mr. Dawson's next claims are brought against each of Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey, asserting that they violated his Fourteenth Amendment procedural[8] due process rights by failing to comply with the Protocol. Mr. Dawson specifically contends that Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey failed to abide by the various monitoring and treatment measures required by the Protocol. These Defendants all move for summary judgment, arguing that Mr. Dawson has not come forward with sufficient evidence to proceed to trial on the claim.

---

[8]  Mr. Dawson does not expressly say whether his due process claim is a procedural or substantive one, and Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey express some confusion on this issue. However, the Court believes that it is clear that where – as here – an inmate challenges a correctional facility's failure to comply with its own regulations or policies as violating his or her Fourteenth Amendment due process rights, that due process claim is a procedural (and not a substantive) one. *See, e.g., Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006); *Hill v. Fleming*, 173 Fed. App'x 664, 674-75 (10th Cir. 2006).

Dr. Ireland, Ms. Sicotte and Mr. Frickey specifically argue that they could not have failed to comply with the Protocol in treating Mr. Dawson's Hepatitis C, because he refused all treatment for it (a fact Mr. Dawson disputes). Ms. Hibbs offers a more nuanced argument, contending that Mr. Dawson has not identified any specific requirement or provision in the Protocol with which he says that she – or Dr. Ireland, Ms. Sicotte and/or Mr. Frickey, for that matter – failed to comply.

Courts generally construe prison inmates' procedural due process rights narrowly, and most failures to comply internal prison regulations or policies by prison staff will not constitute a Fourteenth Amendment due process violation. "Prison regulations are primarily designed to guide correctional officials in the administration of a prison. [They are] not designed to confer rights on inmates." *Brown v. Rios*, 196 Fed. App'x 681, 683 (10th Cir. 2006) (quoting *Sandin v. Conner*, 515 U.S. 472, 481-82 (1995)). Although states may create liberty interests protected by due process in certain cases, they generally will be limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Godlock v. Fatkin*, 84 Fed. App'x 24, 30 (10th Cir. 2003).

Here, as argued by Ms. Hibbs, Mr. Dawson's Fourteenth Amendment due process claims fail because he has not produced evidence that Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey actually violated any particular provision the Protocol. Indeed, the evidence produced in the case shows the contrary. The first screening step in the Protocol is to undergo blood testing to determine whether an inmate is experiencing liver damage sufficient to warrant further medical treatment. The evidence shows that Mr. Dawson underwent that testing in June 2015, and that his results put him in a "watch and wait" status, not a status that called for more affirmative treatment. In short, even when the Court construes the evidence cited by Mr.

Dawson in the light most favorable to him, it cannot discern how Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey failed to comply with any specific responsibilities or duties assigned by the Protocol's treatment guidelines. Summary judgment is warranted on his Fourth Amendment procedural due process claim against those Defendants.

> ### C. Mr. Dawson's Fourteenth Amendment Equal Protection Claim Against Mr. Raemisch, Ms. Tiona and Mr. Archambeau.

Mr. Dawson's next claim is that Mr. Raemisch, Ms. Tiona and Mr. Archambeau violated his Fourteenth Amendment equal protection rights by devising, implementing, and enforcing policies and procedures that deny him, but allow others, access to the Hepatitis C drugs like Harvoni and Epclusa.

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no State shall… deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'keeps governmental decisions makers from treating differently persons who are in all relevant respects alike.'" *Soskin v. Reinerstson*, 353 F.3d 1242, 1247 (quoting *Nordinger v. Hahn*, 505 U.S. 1, 10 (1992)). In other words, "[t]he Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Kitchen v. Herbert*, 755 F.3d 1193, 1222 (10th Cir. 2014) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

In the prison context, in order to succeed on an Equal Protection claim, an inmate must show that he or she was "similarly situated" to other inmates who are treated differently, and that the difference in treatment was not "reasonably related to legitimate penological interests." *Fogle v. Pierson*, 435 F.3d 1252, 1261 (10th Cir. 2006); *Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994). In addition, where the classification is not made with respect to any suspect

category,[9] the classification is subject only to "rational-basis review" and "must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320–21 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993)). An inmate arguing that another similarly-situated inmate is receiving more favorable treatment must show that the two are alike "in every relevant respect." *Templeman*, 16 F.3d at 371; *Meek v. Jordan*, 534 Fed. App'x 762, 764 (10th Cir. 2013).

Mr. Dawson has not come forward with sufficient evidence to satisfy the last requirement. The only inmate whom Mr. Dawson identifies as being similarly situated to him who has received the relevant Hepatitis C treatment is James Richards. The degree of similarity between Mr. Dawson and Mr. Richards evident in the record is superficial and generic – the evidence provided by Mr. Dawson merely shows that Mr. Richards is: (a) African-American; (b) an inmate in the custody of CDOC; and (c) diagnosed with Hepatitis C. But in this context, the degree of similarity at a minimum must relate to the conditions set forth in the Protocol, most importantly that Mr. Dawson and Mr. Richards have similar APRI scores and other pertinent test results. Mr. Dawson's filings do not address Mr. Richards diagnostic results and test scores, and thus, he has failed to demonstrate a triable question as to whether he is similarly situated to Mr. Richards or any other inmate. The Defendants are entitled to summary judgment on that claim.

## V.     Mr. Dawson's Potential Substantive Due Process Claim.

Finally, the Court concludes by again noting that it is unclear whether Mr. Dawson's claims against Mr. Raemisch, Ms. Tiona and Mr. Archambeau solely are Fourteenth Amendment

---

[9]     Here, Mr. Dawson merely claims that he is being treated differently from other prisoners without attributing that alleged disparate treatment to any particular motive or reason, not that he is being treated differently because of his race or any other suspect classification or membership in a protected class.

equal protection ones, or whether Mr. Dawson is also asserting a substantive due process claim against these Defendants – *e.g.* that the Protocol and/or the other CDOC policies and procedures for allocating Hepatitis C medications – including the new medications like Harvoni and Epclusa – are impermissibly arbitrary and capricious.[10]

On the one hand, it is true that as pleaded in his operative Complaint (as well as his initial complaint), Mr. Dawson expressly limits his Fourteenth Amendment claims against Mr. Raemisch, Ms. Tiona and Mr. Archambeau to equal protection ones. On the other hand, in his opposition papers to Mr. Raemisch, Ms. Tiona and Mr. Archambeau's summary judgment motions, Mr. Dawson clearly seems to think that he is asserting a substantive due process claim against those Defendants. He specifically argues in his briefing that the Protocol uses inaccurate and arbitrary liver test scoring systems[11] and blood test markers to determine that an individual with Hepatitis C has deteriorated to the point where the need for treatment is urgent and acute, and that the guidelines improperly ignore painful and debilitating symptoms of the disease that signify that sort of deterioration. Furthermore, in a document entitled "Motion for Court to Take Judicial Notice," which was filed on November 9, 2017 (**#175**), Mr. Dawson reiterates that he is attempting to bring Fourteenth Amendment substantive due process claims, at least against Mr. Archambeau.

If Mr. Dawson is bringing substantive Due Process claims against Mr. Raemisch, Ms. Tiona and Mr. Archambeau, there are a number of significant problems. First, again, that sort of

---

[10]    There is some indication in the briefing that Mr. Dawson may also being attempting to assert substantive due process claims against Dr. Ireland, Ms. Sicotte, Ms. Hibbs and Mr. Frickey. However, because he has not come forward with any evidence suggesting that these Defendants played any role in the creation of the Hepatitis C Protocol, summary judgment is warranted on those claims (insofar as he is bringing them).

[11]    Mr. Dawson especially critiques the use of so-called APRI scores to determine eligibility. He claims that the cutoff score used by CDOC (2.0) excludes roughly half of the people with cirrhosis, who will have an APRI score below that threshold.

theory is not pleaded in his Complaint.  While the Court must construe his pleadings liberally in light of his *pro se* status, the Court need not create a new claim out of whole cloth simply because the litigant decided later to change his approach.  Second, Mr. Dawson's presumed theory that the Protocol violates his constitutional rights by imposing arbitrary and capricious criteria on who is eligible for Hepatitis C treatment seems to be more appropriate for consideration under the deliberate indifference standard of the Eighth Amendment, as opposed to a substantive due process violation under the Fourteenth Amendment.  Where a more specific constitutional governs the conduct in question, that conduct must be examined under that provision's standards, and not some generalized notion of substantive due process.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Coffey v. McKinley Cty.*, 504 Fed. App'x 715 (10th Cir. 2012).

Most importantly, though, Mr. Dawson has not come forward with evidence to support any potential claim that the criteria imposed under the Protocol are arbitrary and capricious or otherwise impermissible.  To be sure, he *contends* that they are, but this is a motion for summary judgment and Mr. Dawson's burden at this stage is to come forward with *evidence*.  Mr. Dawson is not a medical expert and he cannot give medical opinions.  Absent competent evidence form a qualified witness asserting that the criteria used to determine Hepatitis C treatment eligibility under the Protocol are medically inadequate or unreasonable, Mr. Dawson has not carried his burden to avoid summary judgment.  *See Holt v. Werholtz*, 185 Fed. App'x 737, 741 (10th Cir. 2006).  The cases from other jurisdictions cited by Mr. Dawson as "evidence" that the Protocol is improper are equally unavailing.  Judicial opinions are not medical evidence, and insofar as Mr. Dawson references expert opinions given in those matters, expert opinions in other cases presumably involving other Hepatitis C treatment protocols are not evidence either.

At the end of the day, even if a cognizable Fourteenth Amendment substantive due process claim was before the Court, Mr. Dawson had the obligation to come forward with evidence sufficient to establish a *prima facie* case that the Protocol is medically unreasonable or inadequate. He has failed to do so. Summary judgment is warranted on that claim insofar as it is even being brought.

**V. Mr. Archambeau's Motion to Strike, Mr. Dawson's Motion to Take Judicial Notice, and Ms. Hibbs' Motion for Leave to Disclose and Rely Upon Expert Testimony.**

Finally, there are three remaining pending motions currently before the Court. After Mr. Dawson submitted a Surreply in opposition to Mr. Archambeau's Motion for Summary Judgment (**#172**) (without requesting leave to do so), Mr. Archambeau filed a Motion to Strike it (**#174**). In response, Mr. Dawson filed a Motion to Take Judicial Notice (**#175**), in which he indicated that he did not oppose the Motion to Strike, but he asked the Court to take judicial notice of a portion of his Complaint in which he says evidences an intent to bring a Fourteenth Amendment Substantive Due Process claim (as discussed above). The Court has reviewed all of the foregoing motions, as well as Mr. Dawson's Surreply, and it finds that neither the Surreply, nor the portion of the Complaint for which Mr. Dawson asks it to take judicial notice, affect the foregoing analysis. Therefore, both motions are denied as moot.[12]

Ms. Hibbs also comes forward with a Motion for Leave to Disclose and Rely Upon Expert Testimony (**#178**), in which she discloses and requests leave to offer retained and non-retained expert testimony. Because the Court is granting summary judgment on all claims brought by Mr. Dawson, this motion is denied as moot as well.

---

[12] The portion of the Complaint Mr. Dawson would like the Court to take "judicial notice" of is not an adjudicative fact under Fed. R. Civ. Pro. 201. Thus, his motion is denied for this reason as well.

## VI.    Conclusion

The Court hereby orders as follows:

(1) Defendants Robert Frickey, Susan Tiona, and Rick Raemisch's Motion for Summary Judgment (**#152**) is **GRANTED**.

(2) Defendant Jeff Archambeau's Motion for Summary Judgment (**#144**) is **GRANTED**.

(3) Defendants Cynthia Ireland and Trudy Sicotte's Motion for Summary Judgment (**#141**) is **GRANTED**.

(4) Defendant De Ann Hibbs' Motion for Summary Judgment (**#179**) is **GRANTED**.

(5) Mr. Archambeau's Motion to Strike (**#174**) is **DENIED**.

(6) Mr. Dawson's Motion to Take Judicial Notice (**#175**) is **DENIED**.

(7) Ms. Hibbs' Motion for Leave to Disclose and Rely Upon Expert Testimony (**#178**) is **DENIED**.

The Clerk of the Court shall enter judgment on all claims in favor of all Defendants as set forth above.

Dated this 30th day of March, 2018.

BY THE COURT:

Marcia S. Krieger
Chief United States District Judge