# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
### Senior Judge Marcia S. Krieger

Civil Action No. 16-cv-00489-MSK-NYW

JAMES R. DAWSON, Jr.,

      Plaintiff,

v.

JEFF ARCHAMBEAU, CEO of Colorado Health Partners;
RICK RAEMISCH, Executive Director of the Colorado Department of Corrections;
SUSAN TIONA, Chief Medical Officer of the Colorado Department of Corrections;
C. IRELAND, FCF Health Providers;
D. HIBBS;
T. SICOTTE; and
R. FRICKEY,

      Defendants.

---

## OPINION AND ORDER ON REMAND;
## GRANTING MOTIONS FOR SUMMARY JUDGMENT IN PART

---

      **THIS MATTER** comes before the Court pursuant to the "Order and Judgment" and Mandate issued by the Tenth Circuit Court of Appeals affirming in part and reversing in part the Court's order granting summary judgment in favor of all defendants and remanding this matter for further consideration **(# 202 and # 205)**.[1]

## FACTS

      The following facts are undisputed except where noted. They are construed in the light most favorable to Mr. Dawson, and are supplemented as necessary in the court's analysis.

---

[1]       Also pending are the following motions filed by Mr. Dawson: (1) Motion to Set Case for Trial **(# 209)**; (2) motions for appointment of counsel **(# 207 and # 208)**; and (3) Motion for Copy of the Docket **(# 210)**.

Mr. Dawson is an inmate in the custody of the Colorado Department of Corrections ("CDOC") and has been incarcerated since 1992. Mr. Dawson suffers from Hepatitis C. CDOC health care providers first diagnosed Mr. Dawson with Hepatitis C about 25 years ago. Mr. Dawson asserts that his Hepatitis C has progressed over the term of his incarceration and that he is now experiencing symptoms consistent with end-stage liver disease.[2] **(# 102 at 3-9)**.

During the pertinent times herein, Mr. Dawson was housed at the Fremont Correctional Facility ("FCF") in Canon City, Colorado. He alleges that various medical providers at the FCF along with CDOC supervisory officials wrongfully denied him treatment for Hepatitis C pursuant to the CDOC's Clinical Practice Guidelines for the Prevention, Identification and Treatment of Viral Hepatitis C ("Clinical Standards") and for his related symptoms. **(#102 at 7-11)**.

Before 2015, CDOC inmates with Hepatitis C received conventional treatment with interferon and anti-viral medications, which treatment was not always successful in eliminating the disease and often had significant side effects. Beginning in 2015, inmates eligible under the CDOC Clinical Standards applicable to treatment of Hepatitis C could receive new drugs that had impressive cure rates of 95-99% and few significant side effects. Such drugs, known by

---

[2]    Mr. Dawson did not support his responses to the Defendants' motions with a formal affidavit or declaration, as required by Fed. R. Civ. P. 56(c)(1)(A). Nevertheless, his filings, including his verified Amended Complaint **(# 102)**, do contain assertions of fact that appear to be made upon his personal knowledge. Because Mr. Dawson's papers are construed liberally as an unrepresented party, and because he presumably could (and would, if required) be able to reduce the facts of which he has personal knowledge to a sworn affidavit, the Court will treat factual statements clearly within the scope of Mr. Dawson's personal knowledge as if they were properly asserted through an affidavit as required by Rule 56. *See, e.g., Jackson v. Cheyenne Mtn. Conf. Resort*, 92 F. Supp. 2d 1118, 1122 n.3 (D. Colo. 2000).

brand names such as Harvoni and Epclusa, although more effective, were also very costly. **(#179-3 at 2, #102 at 7-10)**.

**2013-2014**

As noted, the 2013 CDOC Clinical Standards for treatment for Hepatitis C used "a combination of pegylated interferon and ribavirin to treat Hepatitis C". **(# 141-20 at 14-17)**. Interferon-based therapy did not cure the virus in all cases, but it was considered to be "helpful to the liver." **(# 141-21 at 8)**. To be eligible for such treatment, the 2013 Clinical Standards required that 1) an inmate complete an approved drug and alcohol treatment program which was 2) to be followed by a liver biopsy then 3) reviewed for Hepatitis C treatment. **(# 141-20 at 7)**. Prior to requesting a liver biopsy, CDOC medical providers recorded relevant information on a Hepatitis C Evaluation Worksheet that was submitted to the Infectious Disease ("ID") Committee for consideration. The ID committee determined whether an inmate was eligible for treatment, and if so, the inmate had a liver biopsy. For treatment, the 2013 Clinical Standards required a finding of stage 3 fibrosis in the liver. Inmates with stage 2 fibrosis were considered on a case by case basis, but inmates with stage 1 fibrosis were not eligible to receive treatment at all. They were to be monitored for progression of the disease. **(# 141-20 at 11-14)**. The 2013 Clinical Standards recommended that periodic screening (annual liver ultrasounds and lab screens every 6 months) of inmates with chronic Hepatitis C and cirrhosis be considered. **(#141-20 at 15)**.

On November 26, 2013, Mr. Dawson states that he requested Hepatitis C treatment during an appointment with Dr. Ireland, a physician at FCF. He complained of "dark tea colored urine, itching, fatigue, swelling in my stomach, light colored stool, and [an occasional] bitter taste in my mouth" along with "disabling pain." **(# 102 at 12)**. However, it does not appear that

Mr. Dawson described the pain he was experiencing, nor asked for treatment to alleviate it. The treatment notes do not indicate that that question of pain was addressed by either Mr. Dawson or Dr. Ireland. Instead, it appears that both Dr. Ireland and Mr. Dawson viewed the recitation of his symptoms in the context of treatment for Mr. Dawson's Hepatitis C. Dr. Ireland informed Mr. Dawson that he needed to obtain documentation verifying that he had previously completed drug and alcohol treatment in accordance with the 2013 Clinical Standards.[3] Dr. Ireland then scheduled Mr. Dawson to meet with someone from the Mental Health Department to assess his condition and determine his eligibility for Hepatitis C treatment. **(# 102 at 12)**.

In January 2014, Mr. Dawson had a follow-up appointment with Ms. Sicotte, a nurse practitioner at FCF. He told Ms. Sicotte that he had seen Dr. Ireland in November 2013, but had not yet received any treatment for his Hepatitis C. He informed Ms. Sicotte that he was still suffering from all of the previously listed Hepatitis C symptoms, including "disabling pain." Again, the record does not reflect that Mr. Dawson described his pain nor requested medication to relieve it. Like Dr. Ireland, it appears that Ms. Sicotte understood Mr. Dawson's description of symptoms to be for the purpose of qualifying for treatment for his underlying Hepatitis C. Ms. Sicotte did not provide any treatment for Mr. Dawson's pain symptoms, but informed him that he was scheduled to meet with the Mental Health Department to discuss his eligibility to receive Hepatitis C treatment. **(# 102 at 12)**.

Several weeks later, on January 29, 2014, Mr. Dawson met with Mr. Frickey, a nurse practitioner at FCF, to discuss treatment options for his Hepatitis C. Mr. Dawson informed Mr. Frickey about his appointments with Dr. Ireland and Ms. Sicotte and recited his various

---

[3]     It does not appear from the record that Mr. Dawson ever provided this documentation to the medical providers.

symptoms noting that his acute abdominal pain, was "not improving." **(# 102 at 12)**. Mr. Dawson states that Mr. Frickey assured him that he would be receiving Hepatitis C treatment, however, Mr. Frickey states that after advising Mr. Dawson of the risks and benefits of the interferon treatment, Mr. Dawson declined it. **(#102 at 12, # 152-3 at 2)**. As with Dr. Ireland and Ms. Sicotte, there is nothing in the record indicating that Mr. Dawson asked for pain relief nor that Mr. Frickey provided any.

**2015**

According to the declaration of Susan Tiona, M.D., who became the Chief Medical Officer at the CDOC in April 2015, three Hepatitis C Clinical Standards were serially issued in May 2015, October 2015, and November 2015 (hereinafter the "2015 Clinical Standards).[4] **(#179-2 at 2)**. The 2015 Clinical Standards included a new, more effective regimen designed to cure Hepatitis C by use of "direct-acting antiviral medications". This approach included the newly available drug, Harvoni. **(# 179-2 at 58-9)**. However, not all CDOC inmates with Hepatitis C were automatically eligible for such treatment. Like the 2013 Clinical Standards, the various 2015 Clinical Standards required that inmates complete an approved drug and alcohol treatment program in order to be eligible.[5] **(# 179-2 at 4-6)**. In addition, eligibility turned on the inmate's degree of liver fibrosis[6], reflected in an APRI score. If an inmate's APRI score was less

---

[4]      There is no evidence in the record that the October 2015 or November 2015 revisions significantly altered the May 2015 Clinical Standards, thus, the Court primarily uses the May 2015 Clinical Standards in its analysis in this section.

[5]      According to the 2015 May Clinical Standards, because Hepatitis C progresses slowly, the requirement to complete drug and alcohol treatment prior to receiving any Hepatitis C treatment "is not expected to contribute to any significant progression of liver disease." **(# 179-2 at 4)**.

[6]      Liver fibrosis is the excessive accumulation of scar tissue in the liver that results from ongoing inflammation that occurs in most types of chronic liver disease. **(# 179-2 at 6)**.

than 0.7, he or she was categorically excluded from treatment. Inmates with APRI scores between 0.4 and 0.7 were entitled to yearly screenings for liver fibrosis and referrals to drug and alcohol treatment. Inmates with APRI scores below 0.4 received only annual screenings for liver fibrosis.[7] **(# 179-2 at 6, 53-58)**. As with the 2013 Clinical Standards, when an inmate requested Hepatitis C treatment, CDOC medical providers compiled a Hepatitis C Evaluation Worksheet, which was submitted to the Infectious Disease ("ID") Committee for consideration prior to authorization of treatment. **(# 179-2 at 7, 57)**.

In August 2015, Mr. Dawson saw Ms. Hibbs, a nurse practitioner at the FCF, to discuss treatment for his Hepatitis C. Again, Mr. Dawson complained of all of the prior identified symptoms including "disabling pain," but the record does not reflect that he requested pain relief or that Ms. Hibbs provided any. **(# 102 at 12)**. Because Mr. Dawson did not produce any documentation that he completed an approved drug and alcohol treatment program as required, Ms. Hibbs counseled him to do so and gave him the Patient Contract to sign. She also began his Hepatitis C Evaluation Worksheet.

**This Action**

In this action, Mr. Dawson proceeds *pro se*.[8] He asserted three claims in the Amended Complaint **(# 102),** each grounded on 42 U.S.C. § 1983:

---

[7]    It appears that later versions of the Clinical Standards (revised in November 2016) were revised to use an APRI score of 0.7 as the cutoff to be considered for treatment, but also stated that an inmate with an APRI score of 0.4 or less would not even be referred for drug and alcohol treatment (which was still a prerequisite for Hepatitis C treatment). **(# 179-2 at 6)**.

[8]    Mindful of Mr. Dawson's *pro se* status, the Court construes his pleadings liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

- Claim One - that Mr. Raemisch, Dr. Tiona, and Mr. Archambeau[9] violated his right to equal protection (invoking the 14th Amendment) by creating, implementing, and applying a discriminatory policy to delay and deny him a cure for Hepatitis C, while providing a cure to other similarly situated inmates, and that these defendants were deliberately indifferent to his serious medical needs, (invoking the 8th Amendment);

- Claim Two - that Dr. Ireland, Ms. Sicotte, Mr. Frickey, and Ms. Hibbs were deliberately indifferent to his serious medical needs, in failing to monitor his Hepatitis C and in failing to provide any treatment for symptoms of that disease (invoking the 8th Amendment);

- Claim Three - that Dr. Ireland, Ms. Sicotte, Mr. Frickey, and Ms. Hibbs violated his due process rights by failing to follow the Clinical Standards for treatment of his Hepatitis C (invoking the 14th Amendment).

The Defendants moved for summary judgment on all claims, asserting qualified immunity because: (i) Mr. Dawson did not come forward with evidence that each Defendant personally participated in the constitutional violation and (ii) Mr. Dawson did not show that the actions he alleges constitute a constitutional violation. This Court issued summary judgment in favor of the Defendants on all claims **(# 186)**. Mr. Dawson appealed to the 10th Circuit Court of Appeals, and it affirmed entry of summary judgment as to the as entirety of Claim Three, the portion of Claim Two alleging that Dr. Ireland, Ms. Sicotte, Mr. Frickey, and Ms. Hibbs were deliberately indifferent in failing to follow the Clinical Standards for treatment of Mr. Dawson's Hepatitis C, and the portion of Claim One alleging a 14th Amendment violation.[10] It reversed

---

[9]     Mr. Raemisch is the Executive Director of the CDOC; Dr. Tiona is the now former Chief Medical Officer of the CDOC; and Mr. Archambeau is the President and Chief Executive Officer of CHP.

[10]     The 10th Circuit affirmed the Court's judgment in favor of Dr. Ireland, Ms. Sicotte, Mr. Frickey, and Ms. Hibbs on Mr. Dawson's claim regarding his request for Hepatitis C treatment under the Clinical Standards **(# 202 at 9)** and his claim that Mr. Archambeau, Mr. Raemisch, and Dr. Tiona violated his right to equal protection under the 14th Amendment by creating, implementing, and applying the Clinical Standards to delay and deny him a cure for Hepatitis C while providing the Hepatitis C treatment to other inmates **(# 202 at 11)**. Further, because it was not raised on appeal, the 10th Circuit did not address the Court's judgment in favor of Dr. Ireland,

7

and remanded the matter for further consideration of the alleged 8th Amendment violation by Dr. Ireland, Ms. Sicotte, Mr. Frickey, and Ms. Hibbs in Claim Two based on " disabling pain" reported by Mr. Dawson. **(# 202 at 2)**. It also directed consideration of "Mr. Dawson's claims that Rick Raemisch, Susan Tiona, and Jeff Archambeau were deliberately indifferent to his serious medical needs, in violation of the [8th] Amendment." **(# 202 at 2)**.

Thus, the Court now focuses on whether there is evidence sufficient to make a *prima facie* showing that (1) Dr. Ireland, Ms. Sicotte, Mr. Frickey, and Ms. Hibbs were deliberately indifferent to Mr. Dawson's complained of symptoms (primarily "disabling pain") and (2) that Mr. Raemisch, Mr. Archambeau, and Dr. Tiona were deliberately indifferent to his serious medical needs. **(# 202 at 13)**. The Court has considered the record which includes the motions for summary judgment, responses, replies, and surreplies, all evidence submitted in support and opposition to those filings[11]. In addition, the Court has considered all of Mr. Dawson's statements or allegations (regardless of the form in which they have been submitted) to the extent they are arguably based upon his personal observation or knowledge. On this record, Court finds and concludes as follows.

---

Ms. Sicotte, Mr. Frickey, and Ms. Hibbs as to Mr. Dawson's claim of a due process violation under the 14th Amendment.

[11] These include: (1) Defendant Jeff Archambeau's Motion for Summary Judgment **(#144)**, Mr. Dawson's response **(# 165)**, Mr. Archambeau's reply **(# 169)**, Mr. Dawson's surreply **(#172)**; (2) Defendant Robert Frickey, Susan Tiona, and Rick Raemisch's Motion for Summary Judgment **(# 152)**, Mr. Dawson's response **(#162 and #165)**, Mr. Frickey, Dr. Tiona, and Mr. Raemisch's reply **(# 164)**, Mr. Dawson's surreply **(# 166)**; (3) Defendants Cynthia Ireland and Trudy Sicotte's Motion for Summary Judgment **(# 141)**, Mr. Dawson's response **(# 161)**, Ms. Ireland and Ms. Sicotte's reply **(# 163)**; (4) Defendant Dee Ann Hibbs' Motion for Summary Judgment **(# 179)**, Mr. Dawson's response **(# 180)**, and Ms. Hibbs' reply **(# 183)**; and Mr. Dawson's Amended Complaint **(# 102)**.

## ANALYSIS

### A.  Procedural Standards

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Produce's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B.  Qualified Immunity

The defendants attack Mr. Dawson's 8th Amendment claims by raising the defense of qualified immunity.[12]  Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). When that defense is raised, the burden shifts to Mr. Dawson to establish two prongs: (i) that he has adequately asserted a violation of a constitutional right, and (ii) the contours of that right were "clearly established" by existing Supreme Court or 10th Circuit precedent (or the weight of authority from other circuits) at the time of the events herein.  *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017).

---

[12]     In their respective motions for summary judgment, some of the defendants invoke the defense of qualified immunity while others simply argue that Mr. Dawson failed to put forth sufficient evidence to establish a prima facie claim under Rule 56.  However, here, because the right is clearly established as explained more fully in this Opinion, the Court's analysis is the same — Mr. Dawson must produce sufficient evidence, taken in the light most favorable to him, which would make a *prima facie* showing of a cognizable claim.

For all practical purposes, the question of whether the evidence shows a violation of a constitutional right is indistinguishable from the inquiry that the Court would make in determining whether the plaintiff has come forward with sufficient evidence to establish a *prima facie* claim in accordance with Rule 56. The plaintiff must produce sufficient evidence, which if true, would make a *prima facie* showing of a cognizable claim. The Court considers the evidence in the light most favorable to the plaintiff and assesses whether it is sufficient to demonstrate the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The second prong focuses upon whether the right was "clearly established" at the time it was violated. The "clearly established" analysis examines whether there was existing precedent, at the time of the challenged events, that recognized a constitutional violation in similar circumstances. Courts are required to conduct the "clearly established" analysis at a "high degree of specificity," rather than in generalities. *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018). However, the specificity requirement is not so exacting that "the very action in question [must have] previously been held unlawful." *Ziglar v. Abassi*, 137 S.Ct. 1843, 1866, 198 L.Ed.2d 290 (2017).

## C. Deliberate Indifference to Serious Medical Needs

The 8th Amendment protects convicted prisoners from cruel and unusual punishment. This includes the right to receive "humane conditions of confinement," which includes the basic necessities of adequate food, clothing, shelter, and medical care, and jail and prison officials must act reasonably to ensure that prisoners receive such basic needs. *Barney v. Pulsipher*, 153 F.3d 1299, 1310 (10th Cir. 1998). It is well established that prison officials violate the 8th Amendment if they are deliberately indifferent to a prisoner's serious medical needs because

such conduct constitutes the unnecessary and wanton infliction of pain. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

To make a *prima facie* showing that the named defendants violated the 8th Amendment, Mr. Dawson must come forward with evidence that, viewed most favorably to him, would (1) objectively prove a "serious" medical need and that (2) subjectively, prove that each defendant was aware that the serious medical need posed a substantial risk to Mr. Dawson's health or safety and notwithstanding such knowledge was deliberately indifferent to it. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Deliberate indifference does not require a showing of express intent to harm Mr. Dawson, only that the official acted, failed to act or delayed action such as treatment, referral or examination despite his knowledge of a substantial risk of serious harm. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005); *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994). A delay in medical care "only constitutes an [8[th]] Amendment violation where the plaintiff can show that the delay resulted in substantial harm," but such harm may be shown by proof that "considerable pain resulted from the delay." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000).

### D. Individual and Supervisory Capacity

A prison official may be sued in two different capacities – individual and official. As an individual, he or she can have either personal or supervisory liability. Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation. *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997). Supervisory liability arises when a defendant-supervisor "creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). However, there is no supervisory

liability under § 1983 based solely on the actions of one's subordinates. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities, a prisoner must show: "(1) personal involvement[,] (2) causation, and (3) required state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013); *see also Dodds*, 614 F.3d at 1199. To establish causation, a prisoner must show that a supervisor "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Dodds*, 614 F.3d at 1200. As to the third element, a plaintiff can "establish the requisite state of mind by showing that [a supervisor] acted with deliberate indifference." *Perry v. Durborow*, 892 F.3d 1116, 1122 (10th Cir. 2018). Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997) (quotations omitted).

An official capacity claim, in all respects other than name, is a claim against the governmental entity employing the official. *Monell*, 436 U.S. at 690 n.55, 98 S.Ct. at 2018. Thus, insofar as Mr. Dawson asserts § 1983 official capacity claims against Mr. Archambeau, Mr. Raemisch, and Dr. Tiona, such claims are against the CDOC. Similar to the elements of supervisory liability, to establish a *prima facie* § 1983 claim against a governmental entity, Mr. Dawson must (i) identify a government's policy or custom; (ii) a causal relationship between the

policy and the underlying violation or injury; and (iii) "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider*, 717 F.3d at 769; *Monell*, 436 U.S. at 658, 691–92, 694, 98 S.Ct. at 2018; *Brown*, 520 U.S. at 407, 117 S.Ct. at 1382.

### E.  Discussion

### Claims against the Medical Providers

At this juncture, the Court makes several observations.  First, the 10th Circuit found that Mr. Dawson's reported "disabling abdominal pain" was an objectively serious medical need. **(#202 at 10-11)**.  Acknowledging this as a serious medical need, the burden is upon Mr. Dawson to show that each defendant was aware of his need and was deliberately indifferent to it.

Second, there is a distinction between treatment of Mr. Dawson's disease, Hepatitis C, which is governed by the 2013 and 2015 Clinical Standards, and his complaints of "disabling pain" that arguably required immediate treatment.  Mr. Dawson understood that the pattern of his symptoms of "dark tea colored urine, itching, fatigue, swelling in my stomach, light colored stool, and [an occasional] bitter taste in my mouth" and "abdominal pain" were indicative of liver failure caused by Hepatitis C.  He recited all of these when requesting treatment authorized by the Clinical Standards - interferon in 2013 and 2014 and the Harvoni-type cure in 2015.  As to application of the Clinical Standards by the treating Defendants, the 10th Circuit upheld summary judgment in favor of the Defendants finding that Mr. Dawson did not come forward with sufficient evidence to show that they violated his rights under either the 8th Amendment (Claim Two) or the 14th Amendment (Claim Three). [13]  Thus, to the extent that Mr. Dawson referred to

"disabling pain" simply as one of a litany of symptoms to justify treatment under the Clinical Standards, there was no 8th Amendment violation.

However, the 10th Circuit expressed concern about Mr. Dawson's persistent complaints of "disabling abdominal pain". Case law regards a prisoner's complaint of "disabling pain" as a signal of a serious medical need[14], and indeed, the 10th Circuit has found and regarded it as such in this case. The reason that severe or disabling pain can be important in the 8th Amendment

---

13    The Clinical Standards for 2013-2015 required an inmate to complete a drug and alcohol program to be eligible for treatment. There is nothing of record that shows that Mr. Dawson satisfied this requirement. Mr. Dawson states that drug and alcohol treatment is waivable under the Clinical Standards. Thus, Dr. Ireland's decision to not provide Mr. Dawson Hepatitis C treatment based on his failure to complete the approved drug and alcohol therapy was contrary to Clinical Standards. **(# 161 at 4)**. But this is nothing more than a conclusory statement. No evidence for the conclusion has been supplied.
      Even if Mr. Dawson was correct that Dr. Ireland could have waived his participation in the required alcohol and drug rehabilitation program, there is no evidence linking her failure to substantial harm to Mr. Dawson. *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *Sealock,* 218 F.3d at 1210. Mr. Dawson's alleges that that he was experiencing "end-stage liver disease" **(#161 at 6)** and that Dr. Ireland's actions "exposed [him] to unnecessary and continued pain and harm from his symptoms of end-stage liver disease and fatal liver cancer." **(# 102 at 5).** These are purely conclusory statements, which require proof by expert testimony. None has been proffered.
14    *See Mata v. Saiz*, 427 F.3d , 745, 754 (10th Cir. 2005) (holding that severe chest pain suffered for several days as the result of a delay in treatment is a sufficiently serious medical need to satisfy the objective prong); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (determining that severe chest pain lasting several hours, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard); *Al-Turki v. Robinson*, 762 F.3d 1188, (10th Cir. 2014) (finding that untreated severe pain causing collapse, vomiting, and fear of death lasting for several hours is a serious medical need); *Oxendine v. Kaplan*, 241 F.3d 1272, 1278-79 (10th Cir. 2001) (holding that twelve hours of debilitating pain accompanied by severe vomiting and "considerable pain [experienced] while [a] finger continued to rot" constituted substantial harm); *Kikumura v. Osagie*, 461 F.3d 1269 (10th Cir. 2006) (finding "torturous" pain lasting 12 hours along with vomiting and mental distress constituted substantial harm); *Perotti v. Serbi*, 786 Fed. Appx. 809 (10th Cir. 2019) (finding that substantial pain lasting five days constitutes substantial harm); *but see Beers v. Ballard*, 248 Fed. Appx. 988, (10th Cir. 2007) (finding that complaints of pain with no indication of the nature or severity did not constitute substantial harm);

context is either because it indicates a serious medical condition or because pain, itself, should be addressed by prison officials.

Here, pain as an indicator of an underlying condition is not at issue. Mr. Dawson's underlying Hepatitis C disease was known and the treatment governed by the Clinical Standards was applied without violation of Mr. Dawson's 8th Amendment rights. Thus, the issues remaining are whether there is evidence that Mr. Dawson was suffering from pain when he met with the treatment providers and whether pain relief could have been provided outside of treatment of his Hepatitis C condition.

As to these issues, the record is muddled. It is unclear whether Mr. Dawson was actually in pain and seeking relief from it when he saw each provider, or whether he simply repeated all of the common symptoms of liver disease that he hoped would justify his participation in the Hepatitis C treatment/cure program. On one hand, he repeatedly complained of serious pain and stated that it was getting no better. On the other, no medical records reflect a request by Mr. Dawson for pain medication and Mr. Dawson did not complain to any provider that he had requested pain medication and that it was not provided. None of the medical providers apparently understood that Mr. Dawson was requesting any immediate medical treatment, only participation in the Hepatitis C treatment/cure program.

If Mr. Dawson referred to "disabling pain" only to participate in the Hepatitis C treatment program under the Clinical Standards or had pain that was treatable only by participation in such program, both this Court and the 10th Circuit have determined that he has made an insufficient showing that the treatment providers violated his 8th Amendment rights by excluding him from the program. If, however, Mr. Dawson's "disabling pain" was a chronic or emergent symptom that could have been treated without treating his Hepatitis C in accordance with the Clinical

Standards, then the medical providers had an obligation to do so.  With this distinction in mind, the Court focuses on whether the evidence, viewed most favorably to Mr. Dawson, is sufficient to show that Mr. Dawson reported his pain symptoms with the purpose of obtaining pain relief and that it could have been treated without his participation in the Hepatitis C treatment program under the Clinical Standards.

**2013-2014[15]**

Mr. Dawson's statements in his verified Amended Complaint and in other various pleadings are taken as true and construed most favorably to him.  Those pertinent to Dr. Ireland follow:

- Dr. Ireland failed to follow the Clinical Standards and monitor Mr. Dawson's Hepatitis C or render any medical treatment for his disease for two years and "exposed [him] to unnecessary and continued pain and harm from his symptoms of end-stage liver disease and fatal liver cancer."  **(# 102 at 5)**.

- Mr. Dawson informed Dr. Ireland of his Hepatitis C diagnosis and that he was experiencing "dark tea colored urine, itching, fatigue, swelling in my stomach, light colored stool, and a bitter taste in his mouth," and "disabling abdominal pain."  Dr. Ireland replied that she was aware of Mr. Dawson's condition and request for Hepatitis C treatment and advised him that "someone from Mental Health would interview [him] soon to evaluate [his] eligibility for treatment." **(#102 at 12, #161 at 1-2)**.

- Dr. Ireland was aware that Mr. Dawson was experiencing painful symptoms from end-stage liver disease but did not provide any treatment.  **(# 161 at 6)**.

As noted earlier, the record is unclear as to 1) whether Mr. Dawson was seeking (and Dr. Ireland understood him to seek) treatment for pain or simply participation in the Hepatitis C treatment program addressed by the Clinical Standards, and 2) whether any treatment could be provided for the pain other than through the Hepatitis C treatment under the Clinical Standards.

---

[15]      The issue of timeliness as to Mr. Dawson's claims has not been raised by any of the parties, thus, the Court will not address it at this time.

Indeed, Mr. Dawson's statements are somewhat inconsistent in this regard, referring both to the Clinical Standards and to failure to treat painful symptoms.

However, these are factual issues. Although the question of application of the Clinical Standards has been resolved, a reasonable jury could find that Mr. Dawson was communicating that he was experiencing acute pain and that some pain relief should have been provided pending determination of his eligibility for the Hepatitis C program. Thus, the Court finds that 8th Amendment claim against Dr. Ireland should proceed to trial but only as to whether she disregarded pain he was suffering at the time of the consultation and failed to treat him without regard to the Clinical Standards.

As to Ms. Sicotte, Mr. Dawson states:

- Ms. Sicotte failed to follow the Clinical Standards and monitor Mr. Dawson's Hepatitis C or render any medical treatment for his disease for two years and "exposed [him] to unnecessary and continued pain and harm from his symptoms of end-stage liver disease and fatal liver cancer." **(# 102 at 5)**.

- On January 7, 2014, during an appointment with Ms. Sicotte, Mr. Dawson informed her that despite Dr. Ireland's statements at his November 2013 medical visit, he had not received any treatment for his Hepatitis C or any further information as to when he would interview with the Mental Health Department. Mr. Dawson also informed Ms. Sicotte that he was experiencing symptoms such as "dark tea colored urine, itching, fatigue, swelling in my stomach, light colored stool, and a bitter taste in his mouth," and "disabling abdominal pain." Ms. Sicotte replied that she would refer Mr. Dawson to Mental Health to determine his eligibility to receive Hepatitis C treatment, but never did so. **(# 102 at 12, #161 at 8)**.

- Mr. Dawson states that Ms. Sicotte was aware that he was experiencing painful symptoms from end-stage liver disease but did not provide any treatment. **(# 161 at 8)**.

Mr. Dawson's showing with regard to Ms. Sicotte is essentially the same as that made with regard to Dr. Ireland. There are factual issues to be resolved as to whether Mr. Dawson communicated that, and Ms. Sicotte understood that, he was currently suffering from pain and

whether she failed to provide treatment other than through the Clinical Standards. A reasonable jury could find that during the appointment, Mr. Dawson was suffering from severe pain and communicated this condition to Ms. Sicotte, who simply disregarded his complaints and provided no treatment to alleviate his pain. As to these issues, the claim may proceed to trial.

As to Mr. Frickey, Mr. Dawson states:

- Mr. Frickey failed to follow the Clinical Standards and monitor Mr. Dawson's Hepatitis C or render any medical treatment for his disease or acute pain and "exposed [him] to unnecessary and continued pain and harm from his symptoms of end-stage liver disease and fatal liver cancer." **(# 102 at 5-6, # 162 at 3)**.

- On January 29, 2014, during an appointment with Mr. Frickey, Mr. Dawson told him about his previous appointments with both Dr. Ireland and Ms. Sicotte and that his condition was worsening. Mr. Frickey "assured" Mr. Dawson that he would be receiving treatment from either Dr. Ireland or Ms. Sicotte. **(# 102 at 12)**. Mr. Dawson also informed Mr. Frickey that he was suffering from acute pain and other symptoms, but Mr. Frickey never provided treatment or took any kind of action to alleviate Mr. Dawson's pain. **(# 162 at 4)**.

- Mr. Dawson disputes Mr. Frickey's claim that Mr. Dawson "appeared" to not want Hepatitis C treatment and contends he specifically asked Mr. Frickey for treatment for his Hepatitis C and related symptoms. **(# 162 at 2)**.

This evidence is slightly different than that pertinent to the claims against Dr. Ireland and Ms. Sicotte. Not only are there the factual issues of what Mr. Dawson communicated and Mr. Frickey understood about Mr. Dawson's pain, it also suggests that Mr. Frickey anticipated that some treatment would be provided for Mr. Dawson's pain by Dr. Ireland and Ms. Sicotte independent of the Clinical Standards. As with the claims against Dr. Ireland and Ms. Sicotte, this claim (limited to Mr. Dawson's pain and its ability to be treated outside the Clinical Standards), will proceed to trial.

**2015**

As to Ms. Hibbs, Mr. Dawson states:

- At an appointment on August 25, 2015, Ms. Hibbs acknowledged Mr. Dawson was suffering from symptoms of end-stage liver disease, but she did not provide him any medical treatment for his Hepatitis C "for a year." **(# 102 at 4, # 180 at 2-5)**.

- On August 25, 2015, during an appointment with Ms. Hibbs, Mr. Dawson told her about his Hepatitis C and abdominal pain, but she did not provide any treatment. **(#102 at 4, # 180 at 2-5)**.

- On August 25, 2015, Ms. Hibbs acknowledged Mr. Dawson was suffering from symptoms of end-stage liver disease, but (1) failed to follow Clinical Standards and submit a referral to the CDOC ID Committee and (2) failed to submit a signed contract to CDOC officials to have Mr. Dawson considered for the treatment program. **(# 102 at 4, 12, # 180 at 2)**.

The evidence here focuses primarily upon Mr. Dawson's participation in the Hepatitis C treatment program, and to that extent his claim has already been resolved. But one statement that Mr. Dawson told Ms. Hibbs about his "abdominal pain" and she provided no treatment is akin to the statements made to the other providers. As with the claims against them, a reasonable jury could find that Mr. Dawson told Ms. Hibbs about his disabling abdominal pain expecting some treatment, she understood this communication, but did not provide any treatment. This evidence, if true, could establish subjective deliberate indifference in that Ms. Hibbs knew there was a substantial risk of serious harm to Mr. Dawson but failed to render any treatment for his acute pain.

Having found a triable claim against the medical providers, the Court now turns to the second prong of the qualified immunity analysis — whether the constitutional deprivation claimed by Mr. Dawson was "clearly established."

As noted, the 8th Amendment forbids "unnecessary and wanton infliction of pain." *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (internal quotation

omitted). Also, it has been clearly established in this Circuit that a deliberate indifference claim will arise when a plaintiff can show that a delay in medical care "resulted in substantial harm," which includes "pain and suffering" that "lasted several hours." *Sealock*, 218 F.3d at 1210. Indeed, "not every twinge of pain suffered as the result of delay in medical care is actionable," however, here, Mr. Dawson's "abnormal" pain lasted for months with no treatment. *Id.* at 1210. Here, Mr. Dawson's complaints, taken as true, were long lasting and severe. Under such circumstances, it was clearly established that the failure to provide any pain relief would be a constitutional violation. Thus, the medical provider defendants are not entitled to the protection of qualified immunity on Mr. Dawson's claim they were deliberately indifferent to his serious medical needs in failing to provide any treatment for acute pain. This claim proceeds to trial.

**Claims against Prison Officials**

The Court now turns to Mr. Dawson's 8th Amendment claims against Mr. Archambeau, Mr. Raemisch, and Dr. Tiona. Although it is far from clear, construed liberally, Mr. Dawson appears to claim that Mr. Archambeau, Mr. Raemisch, and Dr. Tiona are each liable as supervisors in their individual capacities and that the CDOC is liable for their actions in an official capacity.

As to Mr. Archambeau, Mr. Dawson states:

- Mr. Archambeau, the Executive Officer of Colorado Health Partners ("CHP"), was acting under color of state law when he entered into a contract with Mr. Raemisch to create and implement Clinical Standards and/or policies for treating inmates with Hepatitis C. **(# 102 at 2-3)**. These Clinical Standards established requirements as to which individuals would be eligible for receiving the Hepatitis C treatment. Mr. Dawson contends he meets all the eligibility requirements. **(#102 at 8-10, # 165 at 2-7)**.

- Mr. Dawson has been denied Hepatitis C treatment, causing him to suffer unnecessary and continued pain and harm related to his symptoms along with a risk of fatal liver cancer. **(# 102 at 2-3, 11, # 165 at 2-7)**.

- Mr. Archambeau is irrationally determining the inmates who will receive Hepatitis C treatment based on "medically indifferent" criteria. **(# 102 at 8-9, # 165 at 4-11)**.

- The Clinical Standard's referral process is left to the discretion of prison health care providers and other officials and results in the deliberate indifference to Mr. Dawson's serious medical need in that he was not tested for the progression of his Hepatitis C for two years. **(# 102 at 9, # 165 at 4-5)**.

- Mr. Archambeau is using the Clinical Standards to delay and deny Mr. Dawson treatment of both his Hepatitis C and his related symptoms, including disabling abdominal pain. **(# 102 at 10-11, # 165 at 5)**.

Mr. Dawson states in conclusory fashion that Mr. Archambeau, as the President and Chief Executive Officer of CHP, is responsible for application of the 2015 Clinical Standards to him. Mr. Dawson bases this conclusion upon the fact that Mr. Archambeau signed a contract on behalf of CHP by which CHP undertook the responsibility to make decisions about provision of outside medical services for inmates. He states that CHP is a "private company that customizes comprehensive correctional healthcare services for county jails and state corrections systems across the United States" **(# 144-1 at ¶ 2)**, and pursuant to a contract between CDOC and CHP, CHP evaluates whether to approve outside medical services to inmates based on CDOC guidelines and other nationally accepted clinical guidelines and standards. **(# 144-1 at ¶ 4)**. Mr. Dawson also states that pursuant to this contract, "[CHP] shall establish written policies and procedures for denials that include time frames and communication protocols for providing involved providers information about appeals processes." **(# 165 at 33)**.

This evidence is insufficient to establish personal or supervisory liability. First, it is CHP, not Mr. Archambeau, which entered into the purported contract with the CDOC. Second, there is no showing that the subject of the contract included the design, development or implementation of the 2015 Clinical Standards. Third, the unrebutted evidence is that the 2015

Clinical Standards were administered internally by CDOC officials and not delegated to CHP.[16]

**(# 144-1 at ¶¶ 8-11).**  As a consequence, there is no showing of a linkage between Mr. Archambeau individually or as a supervisor in the design or application of the 2015 Clinical Standards.  Furthermore, there is no evidence suggesting that Mr. Archambeau knew or reasonably should have known that the 2015 Clinical Standards would adversely impact Mr. Dawson, or that Mr. Archambeau was aware of any decisions made related to Mr. Dawson's Hepatitis C treatment pursuant to the Clinical Standards.  Accordingly, the Court finds Mr. Dawson has not stated an 8th Amendment claim against Mr. Archambeau.

As to Mr. Raemisch, Mr. Dawson states:

- Mr. Raemisch, the Executive Director of the CDOC, was acting under color of state law when he entered into a contract with Mr. Archambeau to create and implement Clinical Standards for treating inmates with Hepatitis C.  These Clinical Standards established requirements as to which individuals would be eligible for receiving the treatment.  Mr. Dawson contends he meets all the Clinical Standard's eligibility requirements but has been denied treatment.  **(# 102 at 2-2, 8-10, # 165 at 3)**.

- Mr. Raemisch is using the Clinical Standards to delay and deny Mr. Dawson treatment of both his Hepatitis C and his abdominal pain along with exposing him to a risk of fatal liver cancer.  **(# 102 at 2-3, 10-11, # 165 at 2-7)**.

- Mr. Raemisch is irrationally determining the inmates who will receive Hepatitis C treatment based on "medically indifferent" criteria.  **(# 102 at 8-9, # 165 at 4-11)**.

The Court understands Mr. Dawson's claim against Mr. Raemisch to pertain to the creation of the 2015 Clinical Standards.  For a triable claim, Mr. Dawson must come forward

---

[16]     In his declaration, Mr. Archambeau states: he has "never been involved in any decision by CHP related to Mr. Dawson of any kind"; "CHP had no role in drafting any such [Hepatitis C] clinical standard, protocol, or procedure.  Any such clinical standard, protocol, or procedure was drafted and implemented by the CDOC"; "Any decision to treat any CDOC inmate with Harvoni or Epclusa or any other medication for Hepatitis C is made by the CDOC and not CHP"; and "CHP has reviewed all of its records related to Mr. Dawson and none of those records relate to the approval of any treatment concerning Mr. Dawson's Hepatitis C." **(# 144-1)**.

with evidence that, if true, would show that Mr. Raemisch either participated in the design of or supervised the decisions made with regard to Mr. Dawson's eligibility under the 2015 Clinical Standards. Even assuming that Mr. Raemisch as the Executive Director of the CDOC, was tasked with developing "policies and procedures governing the operation of the [CDOC]" **(# 165 at 13)**, this is insufficient to establish his liability on a personal or supervisory theory.

Mr. Dawson must have some evidence that Mr. Raemisch designed or directed the creation of the 2015 Clinical Standards, or that he was involved in implementing the decisions in application of the Standards to Mr. Dawson. *Dodds*, 614 F.3d at 1199-1202. The record simply does not contain evidence to that effect. In addition, there is no evidence that application of the Standards caused Mr. Dawson constitutional harm. To the contrary, the evidence of record shows that Mr. Dawson's ineligibility under the 2015 Standards was a result of not completing the pre-requisites and requirements for treatment. Mr. Dawson has come forward with no evidence that he completed an approved alcohol and drug program or that his lab tests were within the limits proscribed by the Standards.[17] **(# 179-2 at ¶¶ 12, 20-24, 30-32).**

As to Dr. Tiona, Mr. Dawson states:

- Dr. Tiona, the Chief Medical Officer of the CDOC, was acting under color of state law when she developed, maintained, and applied the 2015 Clinical Standards, which are designed to avoid treating Mr. Dawson's serious medical need. **(# 102 at 2-3, 8-10, # 165 at 2-3)**.

- This denial of treatment has caused Mr. Dawson to suffer unnecessary and continued abdominal pain along with a risk of fatal liver cancer. **(# 102 at 2-3, 11)**.

---

[17]     According to Dr. Tiona's declaration, Mr. Dawson's APRI score based on his June 25, 2015 lab results was 0.329. **(# 179-2 at 93-97)**. As a result of this score being less than 0.7, Mr. Dawson was categorically precluded from receiving Hepatitis C treatment. **(# 179-2 at ¶¶ 24, 30-32)**.

- Dr. Tiona is irrationally determining the inmates who will receive the medical treatment under the "medically indifferent" Clinical Standards. **(# 102 at 8-9, #165 at 6-7, 10)**.

- As the supervisor over CDOC medical providers, Dr. Tiona is allowing medical providers through the application of the Clinical Standards, to use their discretion in submitting patient health information rather than having consistent standards as to what information should be provided as to each inmate. This resulted in Mr. Dawson not being monitored for the progression of his disease or given treatment for his symptoms. **(# 102 at 9, # 165 at 4-5, 10)**.

- Dr. Tiona is using the May 2015 Clinical Standards to delay and deny Mr. Dawson treatment of both his Hepatitis C and his abdominal pain. **(# 102 at 10-11, # 165 at 5)**.

Other than making conclusory statements that Dr. Tiona used the Clinical Standards to improperly deny Mr. Dawson Hepatitis C treatment, Mr. Dawson alleges no facts showing that Dr. Tiona had any personal involvement with any decision related to Mr. Dawson's medical treatment, including a denial of Hepatitis C treatment under the 2015 Clinical Standards. Thus, there is no personal liability under § 1983. However, there is evidence in the record that Dr. Tiona, as the Chief Medical Officer for the CDOC from April 2015 until May 2017, "oversee[s], manage[s], and administer[s] the internal health care program within the [CDOC]" and is tasked with "establishing, and implementing clinical policies and protocols developed for the health care practitioners in correctional medicine." **(# 165 at 53)**. This evidence, if true, could show that Dr. Tiona participated in the creation and application of the 2015 Clinical Standards. However, there is no showing that the 2015 Clinical Standards caused harm to Mr. Dawson. Mr. Dawson was ineligible because he had not completed the drug and alcohol treatment program. There is no evidence that he completed the program or that it was not reasonably necessary for him to do so. Finally, there is no evidence that Dr. Tiona, in creating the 2015 Clinical Standards, acted with purposeful disregard or deliberate indifference to Mr. Dawson's serious

medical needs. Mr. Dawson's statements that Dr. Tiona (i) designed the Clinical Standards to avoid treating his Hepatitis and related symptoms; (ii) allowed medical providers to improperly decide who is eligible to receive Hepatitis C treatment; and (iii) denied him Hepatitis C treatment causing him pain and a risk of fatal liver cancer are conclusory, speculative, and inadmissible lay opinions that are insufficient to create a genuine issue of material fact. Furthermore, Mr. Dawson's disagreement with the program's requirements does not state a constitutional violation.

Under these circumstances, Mr. Dawson has not come forward with sufficient evidence to state an 8th Amendment claim of deliberate indifference against Dr. Tiona.

As to official liability by the CDOC, Mr. Dawson must show that he suffered a constitutional deprivation of a constitutional right caused by an official policy or custom maintained by the entity with deliberate indifference to the substantial certainty of constitutional injury. *Monell*, 436 U.S. at 691-692, 694. The Court has previously determined that the denial of Hepatitis C treatment to Mr. Dawson was not a constitutional injury. However, even if it was, there is no evidence that the CDOC's Clinical Standards were enacted/maintained with deliberate indifference to inmate needs and that their enforcement caused injury to Mr. Dawson.[18] Rather, the record evidence shows that the Clinical Standards were created and implemented to treat inmates with Hepatitis C using an effective drug therapy. Because of the cost of this treatment along with the risk of re-infection, the Standard set forth specific requirements and prerequisites

---

[18] Proof of deliberate indifference in the context of an official capacity claim is essentially the same as required for an 8th Amendment claim. A showing of simple or even heightened negligence will not suffice. The flaws in policy must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

for an inmate to be eligible to receive the treatment. Other than Mr. Dawson's conclusory statements, there is no record evidence that these requirements are arbitrary, invalid or somehow designed to keep inmates from receiving appropriate medical treatment. Indeed, the Standards were created using medically accepted guidelines and standards of care from the BOP and other medical associations.[19] There are many ways to allocate resources and prioritize treatment, and to the extent that Mr. Dawson disagrees with the CDOC's medical decisions as to the implementation of Hepatitis C treatment to inmates, this boils down to a difference of opinion, which does not rise to the level of a constitutional violation. Thus, Mr. Dawson has failed to state an official capacity claim.

Accordingly, the Court grants summary judgment to Mr. Archambeau, Mr. Raemisch, and Dr. Tiona.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that the following facts are established for purposes of trial pursuant to Fed. R. Civ. P. 56(g):

- At all relevant times, Mr. Dawson was an inmate in the custody of the Colorado Department of Corrections.

- At all relevant times, Dr. Ireland, Ms. Sicotte, Mr. Frickey, and Ms. Hibbs were CDOC medical providers.

- Mr. Dawson saw Dr. Ireland for a medical appointment on November 26, 2013.

- Mr. Dawson saw Ms. Sicotte for a medical appointment on January 7, 2014.

- Mr. Dawson saw Mr. Frickey for a medical appointment on January 29, 2014.

---

[19] These associations include the American Association for the Study of Liver Diseases and the Infectious Diseases Society of America's Recommendation for Testing, Managing, and Treating Hepatitis C. **(# 179-2 at 89)**.

- Mr. Dawson saw Ms. Hibbs for a medical appointment on August 25, 2015.

- At the medical appointments, Mr. Dawson recited symptoms of end-stage liver disease.

- The medical providers did not provide any medical treatment for the recited symptoms.

- Mr. Dawson did not show the medical providers documentation that he had completed an approved drug and alcohol treatment program as required by the Clinical Standards.

It is further ORDERED that

1.      Defendants Jeff Archambeau, Rick Raemisch, and Susan Tiona's Motions for Summary Judgment **(# 144 and # 152)** are **GRANTED** insofar as the Court has determined, on remand, that Mr. Dawson did not come forward with sufficient evidence to establish a deliberate indifference claim, invoking the 8th Amendment, against these defendants.

2.      Pursuant to the Tenth Circuit's Order and Judgment reversing the Court's grant of summary judgment and upon the Court's consideration on remand, Mr. Dawson's claims, invoking the 8th Amendment, that Defendants Cynthia Ireland, Trudy Sicotte, Robert Frickey, and Dee Ann Hibbs were deliberately indifferent to his serious medical needs in failing to provide any treatment for his reported acute pain shall proceed to a trial.  The parties shall jointly contact chambers within 14 days of this order to schedule the final pretrial conference.

3.      As to the balance of the pending motions: the Motion to Set Case for Trial **(# 209)** is **DENIED** as moot in light of the Court's Opinion; Mr. Dawson's motions for appointment of counsel **(# 207 and #208)** will be decided in a separate order pursuant to the Court's Local Rules; and the Motion for Copy of the Docket **(# 210)** is **GRANTED** insofar as the Clerk of the Court shall mail a copy of the docket report to Mr. Dawson at his address of record as soon as practicable.

Dated this 13th day of January 2020.

BY THE COURT:

Marcia S. Krieger
Senior United States District Judge